| | | |
|---|---|---|
| **THE BRIGHT IDEAS COMPANY, INC.** | ) | **IN THE UNITED STATES** |
| | ) | **DISTRICT COURT FOR THE** |
| **Plaintiff & Counterclaim Defendant** | ) | **DISTRICT OF MARYLAND** |
| | ) | |
| **v.** | ) | |
| | ) | **CIVIL NO.  MJG 05-CV-3015** |
| **TARGET CORPORATION** | ) | |
| | ) | |
| **Defendant & Counterclaim Plaintiff** | ) | |
| _____ | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO TARGET'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Target Corporation's ("Target") motion for summary judgment should be denied, because it has

not proven clearly and convincingly that commercial-level offers of sale occurred more than one year

before the filing date of The Bright Ideas Company's ("Bright Ideas") patent.  Also, numerous material

facts are in genuine dispute and there are numerous discovery deficiencies, making summary judgment

inappropriate at this time.

### ARGUMENT

**I.   SUMMARY JUDGMENT IS INAPPROPRIATE, BECAUSE TARGET HAS NOT PROVIDED THE REQUIRED CLEAR AND CONVINCING EVIDENCE OF COMMERCIAL-LEVEL OFFERS OF SALE MORE THAN ONE YEAR BEFORE THE AUGUST 29, 1998 FILING DATE OF BRIGHT IDEAS' PATENT.**

A conclusion that a 35 U.S.C. 102(b) bar invalidates a patent must be based on clear and

convincing evidence, consistent with the presumption of validity accorded a granted patent. 35

U.S.C. § 282; Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 549 (Fed. Cir. 1990).

Mere preponderance of the evidence will not suffice. Id.

The 35 U.S.C. 102(b) bar includes the on-sale bar currently at issue:

"A person shall be entitled to a patent unless –

(b) the invention was…on sale in this country, more than one year prior to the date of the application for patent in the United States".

Thus, to prevail in summary judgment or at trial, Target must present clear and convincing evidence that Roundabout sales or offers of sale occurred in the United States before August 29, 1997.  Since Target does not contend that actual Roundabout sales occurred before that date, the issue narrows to whether an offer of sale occurred before that date.

It should also be noted that the overriding concern of the on-sale bar is an inventor's attempt to commercialize his invention beyond the statutory term. STX, LLC v. Brine, Inc., 211 F.3d 588, 590 (Fed. Cir. 2000); Woodland Trust v. Flowertree Nursery, Inc., 148 F.3d 1368, 1370 (Fed. Cir. 1998); In re Caveney, 761 F.2d 671, 676 (Fed. Cir. 1985).  Put another way, the on-sale bar's purpose is to prevent patent owners from extending the length of their patent protection by putting their invention on sale years before they apply for a patent. Id.

This has not occurred here.  Neither the inventor nor Bright Ideas commercialized or profited from their invention before applying for a patent, and applying the on-sale bar here will not further the public policy behind the bar.

**A.  Britax Has Acknowledged that the Roundabout Was Not Offered for Sale Until September 1997 – Less Than One Year Before the Filing Date of Bright Ideas' Patent.**

In a July 8, 2002 letter to Bright Ideas, Britax Child Safety, Inc.'s ("Britax") president stated that "The Roundabout with a hook-loop 'tidy' has been on the U.S. market since September 1997, which is about eleven months before the application date of your Patent No. 5979983". Ex. 1.[1]

1.  Plaintiff's exhibits are cited herein as "Ex. _", and defendant's exhibits are cited as "Def.'s Ex. _".

Britax did not state that the Roundabout had been sold since September 1997, but rather that it had been on the market since September 1997. This distinction is important, because when one states that something has been on the market since a given date, the plain meaning is that it has been offered for sale since that date. Indeed, Merriam-Webster defines the term "on the market" as "available for purchase; also: up for sale <put their house on the market>". Merriam-Webster's Collegiate Dictionary, Tenth Edition (1998). American Heritage defines the term "on the market" as "1. Available for buying: *Many kinds of seasonal flowers are on the market*. 2. Up for sale*: They put the family business on the market*." American Heritage Dictionary of the English Language, Fourth Edition (2000), emphasis in original. When goods, real property, etc. are put on the market, it means they are offered for sale. Exs. 2 and 3.

Britax's statement directly rebuts Target's contention that the Roundabout car seat was offered for sale in August 1997. The Britax letter is from Thomas Baloga, who was Britax's president in 1997 and who was certainly in a position to know when the Roundabout was first offered for sale. Baloga attended the August 8-9 sales meeting (Ex. 4, p.2), was familiar with Roger O'Callaghan and Stanford Distributing Corporation's ("Stanford") participation in pre-launch activities (Ex. 4, p.2 ; Ex. 5), and would have also been familiar with any offers for sale or orders if such had occurred before September 1997. Further, Baloga's 2002 memory of 1997 events is likely to be better than his or anyone else's memory now, several years later.

### B. Much of Target's Supporting Material Is Irrelevant to the On-Sale Issue.

The issue in this phase of the action is whether the Roundabout car seat was on sale in the United States more than one year before the August 29, 1998 filing date of Bright Ideas' patent. Again, the part of 35 U.S.C. 102(b) relevant to this issue reads:

"A person shall be entitled to a patent unless –
(b) the invention was…on sale in this country, more than one year prior to the date of the
application for patent in the United States".

In its motion, Target presents much material that is not relevant to the on-sale issue.  For
example, Target presents a declaration alleging Australian sales of a "Baby Safety Capsule" car
seat. Def.'s Ex. 3.  This declaration is not relevant to the on-sale issue, because the alleged sales
were not in the United States. 35 U.S.C. 102(b).  Moreover, the "Baby Safety Capsule" car seat
does not meet the requirements in claims 16-19 of Bright Ideas' patent and therefore could never
invalidate those claims, because this car seat does not employ a hook-and-loop (Velcro[®]) harness
holder.  Instead, in the "Baby Safety Capsule" car seat, the metal harness tongues are slid under
an elastic strap attached to the seat body. Ex. 6.

Target also presents a user guide allegedly packaged with the "Baby Safety Capsule" car
seat. Def.'s Ex. 3A.  This user guide is not relevant to the on-sale issue, and it fails to invalidate
Bright Ideas' patent for other reasons as well.  First, the user guide does not show the hook-and-
loop (Velcro[®]) harness holder defined in claims 16-19 of the patent. Id.  Second, even if the user
guide did show the hook-and-loop feature, it should not be considered a "publication" within the
meaning of the statute because the guide was simply included with the product and was thus just
a part of the Australian sales, which as discussed above are not relevant.

Target also presents a British patent application and a related declaration. Def.'s Exs. 2
and 2A-C.  This material is also not relevant to the on-sale issue.  Moreover, the British
application does not invalidate Bright Ideas' patent on any basis, because it was never published.
Instead, it was abandoned on September 30, 1998, prior to publication. Ex. 7, p. 2.  Of note, the

date of invention for Bright Ideas' patent predates Britax's date of invention, and Bright Ideas will provide evidence of its date of invention when it is relevant.

Target also presents a Britax income statement. Def.'s Ex. 10A.  However, this statement does not show any Roundabout sales or orders prior to September 1997, and thus is not relevant to the on-sale bar.  Further, the sales shown for September-December 1997 are <u>forecast</u> sales, not actual sales – and the forecast may have little connection with reality.  Indeed, the exhibit is labeled "FCST#4" at the bottom right-hand corner, and this indicates that it was but one of several forecasts that were made.

Target also presents a costing review, a purchase order and agreement for car seat components, and a fax to a component supplier. Def.'s Exs. 10B-E.  However, these only indicate that Britax was preparing to manufacture the Roundabout – and that is not the issue.  Instead, the issue is whether contractually binding, commercial-level offers of sale were made prior to August 29, 1997, and these manufacturing documents are simply not relevant to that issue.

What remains relates to the Confidential Memo (Ex. 8) and Britax spreadsheet (Ex. 9).  These do not constitute commercial-level offers for sale, as explained below:

## C.  <u>The Confidential Memo Did Not Trigger the On-Sale Bar, Because It Was Not Between Separate Entities.</u>

In order to trigger the on-sale bar, an offer must take place between separate entities.  <u>Caveney</u>, 761 F.2d at 676.  The reason for this requirement is straightforward – if an offer takes place between parts of essentially the same entity, then it is an illusory offer, and not a real commercial offer. <u>Id</u>.

**1.  Stanford, Baby News, and the Baby News Stores are part of one overall organization.**

Here, the Confidential Memo was not a communication between separate entities, because Stanford, the sender of the Confidential Memo, also does business under the "Baby News" name.  Baby News, in turn, maintains a network of stores throughout the United States, and the stores that allegedly received the Confidential Memo were part of this network.

For example, the top of Stanford's Internet home page reads "Stanford Distributing and Baby News – We deliver everything but the baby[©]" Ex. 10.  A button on Stanford's home page invites the user to "Visit a Store" (Id.), and when the user clicks on this button, information on Baby News' 50 U.S. stores and 11 overseas stores is displayed. Ex. 11.  Every store that received the Confidential Memo is listed as a Baby News store. Ex. 11 and Ex. 12, interr. 4.  The email address for the Baby News main office is info@stanforddistributing.com. Ex. 11, p.5.  The physical addresses for Stanford and Baby News are identical, they use the same fax number, and their telephone numbers differ by only the last digit. Exs. 13 and 14.

Dun & Bradstreet, the leading corporate and credit information service, lists Stanford as "dba [doing business as] 'Baby News Stores'". Ex. 15.  Dun & Bradstreet's comprehensive report on Stanford identifies it as "Baby News Stores", and also lists Stanford's www.babynewsonline.com Internet sales site. Ex. 16.  Reference USA, another well-known corporate and credit information service, lists Baby News Stores as a subsidiary of Stanford. Exs. 13 and 14.  Reference USA further lists the Aldrich Baby News, Citikid Baby News, and Merry-Go-Round Baby News stores – all of which were alleged Confidential Memo recipients – as branches of Stanford, with headquarters at Stanford. Exs. 17-19.

The Baby News Internet site touts the advantages of joining the Baby News organization (Ex. 20), and emphasizes the "benefit of becoming a part of Baby News". Ex. 21.  The site states further that Baby News has "over 50,000 sq. ft. of warehouse space available to <u>our stores</u>" Ex. 22, emphasis supplied.  Baby News also states that "We send out weekly memos to <u>our stores</u>", and shows an example memo with the prominent heading "Stanford Distributing". Ex. 23, emphasis supplied.  Baby News further states that its website allows "<u>our stores</u> to keep track of their orders with <u>our warehouse</u>". <u>Id.,</u> emphasis supplied.  In its Confidential Memo, Stanford states that "<u>We</u> are encouraged that [Britax is] trying to maintain margins for retailers, since <u>we</u> have trouble maintaining these margins <u>ourselves</u> – especially back East". Ex. 8, para. 7, emphasis supplied.

Even the Baby News trademark is owned by Stanford. Ex. 24.  The mark has been in use since 1962, coincident with Stanford's founding, and it covers <u>retail</u> children's department store services, not distributor or wholesaler services. <u>Id</u>  This further shows that the Stanford/Baby News business has retail aspects.

**2.  Target admits that the memo-recipient stores were Britax's customers, not Stanford's.**

In addition, in its interrogatory answers Target repeatedly refers to the memo-recipient Baby News stores not as Stanford's customers, but rather as <u>Britax's customers</u>. Ex. 25, interr. 6. In an April 10 follow-up letter to Target, Bright Ideas sought clarification on Target's use of this surprising terminology to refer to the memo-recipient stores. Ex. 26, p. 2, interr. 6.  In an April 12 reply to the follow-up letter, Target reiterated that the memo-recipient stores were Britax's customers and not Stanford's: "There was no agreement between Stanford Distributing and Britax's customers, who were the "recipients" of the offers to sell". Ex. 27, interr. 6.  This shows

7

that, at least for purposes of the alleged offer, the memo-recipient Baby News Stores were not

Stanford's customers, but rather members of Stanford's organization.  It also indicates that any

subsequent transactions would have been between Britax and the memo-recipient stores, either

directly or with Stanford acting as a mere conduit for its stores.  Put another way, the

Confidential Memo did not constitute a contractually binding, commercial-level offer of sale,

because Stanford was not making an offer to sell to the memo recipients.  Any contractually-

binding, commercial transactions would instead have been between Britax and Britax's

customers, the memo-recipient stores.

### 3. The price shown on the Confidential Memo demonstrates that it was not an offer to unrelated, arms-length recipients.

Further, the $120 Roundabout car seat price listed on the Confidential Memo (Ex. 8) is

the <u>exact same $120 price</u> that Britax was selling the Roundabout for. Ex. 28, p. 2, § 3.2.  This

shows that the Confidential Memo was not an offer by Stanford to sell Roundabouts to unrelated,

arms-length memo recipients.  Instead, it was a communication from Stanford/Baby News

headquarters to its stores of a collective buying opportunity, in keeping with the nature of the

Baby News organization.  If Stanford were truly acting as a distributor to the memo recipients,

the price shown on the Confidential Memo would have been higher than the $120 charged by

Britax – say, $130, so that Stanford could make a profit on the transaction.

It should be noted that Britax could not have sold Roundabouts to Stanford for less than

the $120 Britax charged its other customers, because doing so would have violated the

Robinson-Patman Act.  The 1936 Robinson-Patman Act, which amended the 1914 Clayton Act,

is codified in 15 U.S.C. § 13(a)-(f).  The Act prevents price discrimination, by prohibiting a

manufacturer from selling to a favored distributor at one price while selling to its other customers at another, higher price:

> "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality". 15 U.S.C. § 13(a).

Britax was very aware of legal issues related to pricing, as evidenced in its Sales Meeting Minutes: "Britax has consulted with a leading authority on the legal ramifications of pricing policy"; "Price collusion is prohibited by state and federal law and is not allowed by Britax". Ex. 28, p. 2, § 3.1.  In sum, it is very unlikely Britax would have sold Roundabouts to Stanford for less than the $120 Britax charged its other customers.

### 4. The Memo's confidential labeling, and its language, shows that it was not a communication to unrelated, arms-length customers.

Finally, even the fact that the Confidential Memo was labeled and presented as "confidential" (Ex. 8) indicates that a confidential relationship existed between the sender and recipients.  The language of the Confidential Memo is instructive and commanding; for example, "there are a few important developments that you need to act upon". Id., para. 1.  Thus, the Confidential Memo can hardly be considered a typical, commercial-level offer sent out to unrelated, arms-length customers, as Target contends.

### D. <u>Even if the Confidential Memo Was Between Separate Entities, It Did Not Rise to the Level of a Commercial Offer of Sale.</u>

Importantly, not all offers of sale will invoke the on-sale bar.  An offer of sale must be a contractually binding, commercial-level offer of sale to invalidate a patent.

"Only an offer which rises to the level of a *commercial offer for sale*, which the other party could make into a binding contract by simple acceptance (assuming consideration) constitutes an offer for sale under [section] 102(b)". <u>Group One, Ltd. v. Hallmark Cards, Inc.</u>, 254 F.3d 1041, 1048 (Fed. Cir. 2001).

To determine whether a formal commercial offer for sale was made, one looks to the general principles of the Uniform Commercial Code ("U.C.C."). <u>Id.</u> at 1047. Those principles state that the course of dealing between parties and the course of performance for a given transaction are useful in interpreting the conduct of the parties in offer, acceptance, and contract formation. U.C.C. §§ 1-201(3), 1-205, 2-208.

### 1. The course of dealing and course of performance show that the Confidential Memo was not a commercial-level offer of sale.

Here, the course of dealing between Stanford and the memo recipients and the course of performance for this particular transaction both point to the Confidential Memo not being a formal, commercial-level offer of sale. As for course of dealing, it is simply not plausible that Stanford and its stores conducted their business via response stubs attached to confidential memos. Stanford and its stores must have had regular order procedures, to handle other orders by the memo recipients – i.e., orders not prompted by a memo. These would include orders for subsequent car seats and goods other than car seats. Stanford and its stores likely employed price lists, order forms, purchase orders, etc. to transact their business, and since the Confidential Memo was outside that regular course of dealing, this indicates that the Memo was not a formal, commercial-level offer of sale but instead an informal survey of interest.

As for course of performance, the transaction activity after the alleged offer indicates that it was not a formal, commercial-level offer of sale. There were no known responses to the

10

Confidential Memo (Ex. 29, interr. 11), and thus any subsequent orders or sales were transacted either using regular procedures between Stanford and its stores or directly between Britax and the stores, who after all were <u>Britax's</u> customers. Exs. 25-27.  Said another way, the alleged recipients did not consider the Confidential Memo to be a formal, commercial-level offer, because they never responded to it and instead used other means to order and purchase the seats.

U.C.C. and general contract principles also hold that to create a binding contract, both parties must intend to be bound. U.C.C. §§ 1-201(3), 2-204.  It goes without saying that an offeror must intend to be contractually bound by its offer.  Also, certainly to create a binding contract by simple acceptance (as required in <u>Group One</u> for commercial-level offers), an offeree must also intend to be bound by that acceptance.  Thus, both parties must intend to be bound by the offer and acceptance for the offer to be a commercial-level offer of sale.  The course of dealing and course of performance evidence discussed above show that this was not the case with the Confidential Memo.

### 2. Target has not proven that the Confidential Memo was even sent.

Target has provided nothing to substantiate that the Confidential Memo was even sent, besides the sole word of Roger O'Callaghan.  The fax transmission line at the top of the Memo does not show that it was sent to the alleged recipients, only to Britax. Ex. 8.  There is also no substantiating evidence to show that the Memo was mailed to the alleged recipients.  Given Britax's tightly-controlled order policy that mandated "all orders to be entered on Britax-provided order form, by sales rep only" (Ex. 28, p.1, § 2.3), it is entirely plausible that Stanford

prepared the Confidential Memo and first faxed it to Britax for approval – whereupon Britax

nixed the Memo because the response stub portion violated Britax's order policy.

Moreover, Target has provided nothing from the other side – the alleged memo recipients

– to establish that anyone received the Confidential Memo, or that the memo recipients

considered the Memo contractually binding if they requested car seats through it instead of

through normal ordering procedures.  The Memo was not addressed to anyone in particular – not

even the Baby News store manager or person responsible for ordering product for the store. Ex.

30, top para..  Target also concedes that there were no known responses to the Memo (Ex. 29,

interr. 11) – and one would expect responses if the Memo was in fact sent and the recipients

considered it a contractually-binding, commercial offer of sale.

### 3.  Stanford's memos to its stores were informational in nature, and did not constitute an alternate, commercial-level ordering system.

The Baby News Internet site is instructive on the content and purpose of the memos

Stanford sends to its stores:

> "We send out weekly memos to our stores relating information about the juvenile
> industry.  These memos include valuable information such as good sellers, new
> items, idea exchanges, and educational-type articles and recalls.  All these
> mailings are intended to keep our stores as informed as possible and as up to date
> as possible in the industry so they can make the best decisions possible".  Ex. 23.

This passage clearly shows that Stanford's memos are intended to promote the exchange of

information and ideas.   Nowhere is it mentioned or implied that Stanford's memos also provide

an alternate, commercial-level ordering system.

### 4.  Stanford did not purchase and re-sell Britax car seats to its stores, because that would have violated Britax's sales and distribution policy.

Target contends that Stanford was a distributor for Britax, and that Stanford bought car seats from Britax for re-sale to retail stores including the memo recipients. Ex. 31, interr. 5. However, Target has not produced a distribution agreement covering this activity.  Target contends that the agreement was oral, but has not stated its terms and conditions as requested. Ex. 32, interr. 19.  Moreover, such an agreement between Britax and Stanford would violate Britax's Sales and Distribution Policy, which forbade dealers from selling product for the purpose of resale:

> "An authorized dealer, therefore, is expected to limit its sales of Britax products to end-users (consumers).  Britax will not continue to do business with any authorized dealer who resells Britax products to any other person or entity for the purpose of resale". Ex. 33, p.1, para. 5.

In other words, Britax sold directly to stores that then sold to end-users, and would not sell to Stanford if Stanford was a "middleman" that was reselling to other stores.

Britax's Sales and Distribution Policy further forbade the "use of telephone or mail order as a method of sales", and states that "We will not do business with dealers who employ telephone or mail order as a method of sales". Id. at p.2, para. 1.

These two tenets of Britax's tightly-controlled policy further demonstrate that the Confidential Memo did not constitute a formal commercial offer, because if Stanford actually offered Britax car seats for sale by fax and mail and also accepted orders in this manner, Britax would not have done business with them.  Similarly, if Stanford actually offered Britax car seats for sale to other entities that would then resell the seats, Britax would not have done business with them.

13

**E.   Target Has Not Provided Clear and Convincing Evidence That the Purported Orders Shown on the Britax Spreadsheet Resulted From Contractually Binding, Commercial-Level Offers of Sale.**

**1.   Target lacks sufficient substantiation for the purported spreadsheet orders.**

As with the Confidential Memo, Target must show by clear and convincing evidence that the purported orders shown on the Britax spreadsheet (Ex. 9) resulted from formal, commercial-level offers of sale. Group One at 1048.  Target has not provided such clear and convincing evidence, because it has not provided the information needed to substantiate that these particular orders stemmed from commercial-level offers of sale.  We do not have the orders themselves; we do not know who the purported orderers were and the circumstances in which the orders were taken; and importantly, we do not know whether the orderers considered the orders to be contractually-binding.  We do not know whether these orders or the alleged underlying offers of sale specified the price, credit terms, freight terms, and other commercial parameters.  We also do not know whether these orders were entered on a Britax-provided order form, as required by Britax's tightly-controlled order policy. Ex. 28, p. 1, § 2.3.  Target has provided no completed order forms corresponding to the purported orders, no purchase orders from the orderers, and no other substantiating order paperwork.

**2.  There is evidence that Britax itself did not consider the spreadsheet orders binding.**

Moreover, there is evidence that Britax itself did not consider the purported orders to be contractually-binding, because it expressly stated that "Roundabout will be placed only with stores that comply with the Britax sales policy.  The Roundabout Versa-tether must be demonstrated.  Stores must therefore have a demonstration rig in each site that sells the Roundabout, and be able to fulfill the

consumer support policy in other regards". <u>Id.</u>  It is highly unlikely that during the tumultuous pre-launch period, Britax had checked out each orderer to ensure that the orderer complied with the Britax sales and consumer support policies and had also ordered a demonstration rig.   Thus by its own policy, Britax would not have considered itself bound to execute an actual sale unless an orderer met these stringent requirements.  <u>Indeed, the spreadsheet does not show any demonstration rig orders at all – and thus the orders that are shown could not possibly have stemmed from binding offers of sale.</u>  Ex. 9.

**3.  Britax's intention in August 1997 to keep the coming Roundabout launch confidential shows that it was not making formal, commercial-level offers of sale at that time.**

In addition, it was Britax's stated intent in August 1997 to keep the coming Roundabout launch confidential, and this belies Target's contention that Britax was making formal, commercial-level offers of sale and actively taking orders during that time.  Britax's August 1997 sales meeting agenda emphasizes the need for confidentiality:  "2.2 Status on Roundabout. Demo and training on Roundabout. (*yes, this is the convertible Freeway and it is nearly ready. Please keep this confidential for the moment*)".  Ex. 34, § 2.2, emphasis in original.

**4.  Given that Britax did not even manufacture the burgundy check Roundabout until September 1997, and did not manufacture the zodiac Roundabout until January 1998, the spreadsheet "orders" could plausibly be non-binding expressions of interest.**

The orders shown on the Britax spreadsheet cannot simply be imputed to formal, commercial-level offers of sale, because of the specific situation in August 1997 vis-à-vis the Roundabout.  Britax was preparing to launch the Roundabout, but had not yet even manufactured the car seat. Exs. 35 and 36, 1st batch lines.  In fact, Britax did not manufacture the burgundy

check pattern Roundabout until September 1997, and did not manufacture the zodiac pattern

Roundabout – the subject of purported August 1997 orders – until <u>January 1998</u>.  <u>Id.</u>  In such

fluid situations, demand is uncertain, and it is not at all unusual for a manufacturer to survey its

customers and solicit "pre-orders" that are merely non-binding expressions of interest intended to

help the manufacturer roughly estimate demand and plan initial production.

**5.  Target has provided no evidence from anyone with first-hand knowledge of the particular spreadsheet it relies on.**

Further, Target has not provided evidence from someone with first-hand knowledge of

<u>this particular spreadsheet</u>, and instead presents a declaration from Britax's current controller,

Shea Nygaard.  Def.'s Ex. 10.  However, Nygaard merely has general knowledge of Britax's

financial reporting, and Target does not contend that she was even a Britax Child Safety

employee during 1997. <u>Id.</u>  Thus, we do not know who prepared the spreadsheet, or the

information sources he or she used to develop the purported order figures.  Target has not

presented versions of the same spreadsheet from preceding or succeeding months, to demonstrate

that this particular spreadsheet was more than just a draft, one-off exercise, or "what-if" scenario,

such as are commonly done by sales forecasters.  If the spreadsheet truly was a regularly

conducted business activity, there would be other spreadsheets available from the same time

period.

**6.  Target has provided no evidence from anyone with first-hand knowledge of the particular orders shown on the spreadsheet.**

There is also nothing from anyone at Britax to substantiate or describe the particular orders shown on the spreadsheet.  Instead, Target presents a declaration from Turk Fritts, wherein Fritts states that he was informed at the August 8-9, 1997 Britax sales meeting that the Roundabout was fully ready for sale, and was authorized to immediately begin offering it. Def.'s Ex. 9.  However, this is directly contradicted by the meeting agenda, which stresses that the Roundabout "*is nearly ready.  Please keep this confidential for the moment*". Ex. 34, § 2.2, emphasis in original.  Fritts also states that Roundabouts were being manufactured at that time, when in fact Britax did not manufacture the burgundy check Roundabout until September 1997 and did not manufacture the zodiac pattern Roundabout until January 1998. Exs. 35 and 36, 1st batch lines.

In sum, the Britax spreadsheet is a bare document that does not itself show an offer of sale, much less a formal, commercial-level offer of sale.  Given the pre-launch situation in August 1997, wherein the Roundabout had not yet even been manufactured and Britax wished to keep the launch confidential, the order figures on the spreadsheet cannot simply be imputed to formal, commercial-level offers of sale.  To meet its burden, Target cannot simply show that the spreadsheet order figures stemmed from offers of some kind.  Instead, Target must show clearly and convincingly that the spreadsheet order figures stemmed from contractually binding, commercial-level offers of sale – and it has not.

## II.   SUMMARY JUDGMENT IS INAPPROPRIATE, BECAUSE MATERIAL FACTS ARE GENUINELY IN DISPUTE.

Summary judgment is appropriate only when the evidence demonstrates that "there is no genuine issue of any material fact". Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party has the burden of showing that no factual issues exist, and in light of this burden, any inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962, per curiam); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990).  All of the nonmovant's evidence is to be credited, and all justifiable inferences are to be drawn in the nonmovant's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

Here, there are numerous material facts that are genuinely in dispute.  These issues of material fact are apparent from the discussion earlier in this memorandum, and include at least the issues listed below:

1)   Whether there were formal, commercial-level offers of sale for the Roundabout before August 29, 1997, given Britax's own statements to the contrary in its July 8, 2002 letter.

2)   The nature of the business relationship among Stanford, Baby News, and the memo-recipient Baby News stores, in general and in connection with the specific transaction alleged by the Confidential Memo.

3)   Whether Stanford acted as a Britax distributor in the specific transaction alleged by the Confidential Memo – i.e., taking ownership of Roundabout car seats and then re-selling them to the memo-recipient Baby News stores.

4)   If Stanford did take ownership of the Roundabout car seats, whether the price charged by Britax to Stanford was the same $120 price shown on the Confidential Memo.

5)   Whether the Confidential Memo was ever sent to the alleged recipients, or merely to Britax.

6)   Whether the Roundabout car seats were in fact ordered by means other than the Confidential Memo, for example the Britax-provided order form required by Britax's tightly-controlled order policy.

7)   Whether Stanford's memos to its stores were informational in nature or instead constituted an alternate, commercial-level ordering system.

8)   Whether the purported orders shown on the Britax spreadsheet stemmed from formal, contractually binding offers of sale or from informal solicitations of interest for a product yet to be manufactured.

9)   Whether Britax made contractually binding, commercial-level offers of sale in August 1997, given its desire for confidentiality on the coming Roundabout launch which was emphasized at its August 1997 sales meeting.

10)  Whether the purported orders shown on the spreadsheet were taken by a Britax sales rep and entered on a Britax-provided order form, as required by Britax's order policy.

11)  Whether the orderers – and Britax itself – considered the purported orders shown on the spreadsheet to be formal and contractually binding, given Britax's restrictive sales policy requiring compliance with Britax's consumer support policy and the purchase of car seat "demonstration rigs".

**III.  SUMMARY JUDGMENT IS INAPPROPRIATE, BECAUSE REQUESTED INFORMATION CONCERNING MATERIAL FACTUAL ISSUES HAS NOT BEEN PROVIDED IN DISCOVERY [RULE 56(f) AFFIDAVIT].**

There are discovery deficiencies in this action which involve issues of material fact.  On May 4, 2006, Bright Ideas moved to compel discovery on these deficiencies, and this matter has not yet been resolved.  Without repeating in detail the motion to compel, which is in the case file and incorporated herein by reference, the discovery deficiencies include information about the business relationship between Stanford and the memo-recipient stores; the identity of persons at the memo-recipient stores with knowledge of the Confidential Memo; communications within and among Target, Britax, Stanford, and the memo-recipient stores; responses, if any, to the Confidential Memo; the price charged by Britax to Stanford for the car seats allegedly offered in the Confidential Memo; and Britax's and Stanford's order and sales procedures.

In addition, the Britax spreadsheet (Ex. 9) relied on heavily by Target only surfaced on May 1, 2006, just two weeks before the end of the abbreviated discovery period ordered by the Court. Ex. 37, p.1, para. 1.  Bright Ideas promptly served interrogatories and production requests seeking information about the Britax spreadsheet, and this discovery has not yet been provided. Bright Ideas deserves a full opportunity to investigate the Britax spreadsheet, since Target surfaced it so recently and is relying on it so heavily.

Further, immediately after the May 4, 2006 case planning conference, Bright Ideas noted depositions to Target. Exs. 38 and 39.  Bright Ideas plans to depose one or more persons with personal knowledge of the Britax spreadsheet and/or the purported orders shown thereon.  Bright Ideas also plans to depose one or more persons at the memo-recipient stores who had personal knowledge of the Confidential Memo and/or would have been responsible for ordering

20

Roundabouts either by responding to the Memo or by other means.  These persons are as yet

unidentified, and are the subject of unanswered discovery requests by Bright Ideas.

A Rule 56(f) affidavit attesting to the above discovery deficiencies is attached as Exhibit

40.

## **CONCLUSION**

For all the above reasons, Target's motion for summary judgment should be denied.

Target has not proven by clear and convincing evidence that commercial-level offers of sale

occurred more than one year before the filing date of Bright Ideas' patent.  In addition, numerous

material facts are in genuine dispute, making summary judgment inappropriate.  Finally, there

are numerous discovery deficiencies, making summary judgment inappropriate at this time.


Respectfully submitted,


_____/s/_____

John A. Galbreath
Bar # 27,703
Galbreath Law Offices, P.C.
2516 Chestnut Woods Ct.
Reisterstown, MD 21136-5523
TEL: 410-628-7770
FAX:  410-666-7274
EMAIL:  jgalbreath@galbreath-law.com
Counsel for Plaintiff

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the date below, copies of this document and referenced attachments are being served via the Court's CM/ECF system on all counsel of record who are deemed to have consented to electronic service.


2 June 2006                                     <u>/s/ John A. Galbreath</u>